**PENSKE LOGISTICS and Gallagher Bassett Services, Inc.,**
**Petitioners**

**v.**

**WORKERS' COMPENSATION APPEAL BOARD (TROXEL),**
**Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Dec. 12, 2014.
Decided June 17, 2015.
Reconsideration/Reargument
Denied July 23, 2015.
Publication Ordered Feb. 23, 2016.

---

Dennis P. Cullen, Lemoyne, for petitioner Penske Logistics.

Melissa R. Chandy, Philadelphia, for respondent Edwin Troxel.

BEFORE: DAN PELLEGRINI, President Judge, and MARY HANNAH LEAVITT, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge MARY HANNAH LEAVITT.

Penske Logistics and Gallagher Bassett Services, Inc. (collectively, Employer) petition for review of an adjudication of the Workers' Compensation Appeal Board (Board) granting compensation to Edwin Troxel (Claimant). In doing so, the Board affirmed the decision of the Workers' Compensation Judge (WCJ) that Claimant met his burden under the Workers' Compensation Act[1] (Act) of proving that he gave timely notice to Employer of his work injury by telling another employee that he fell. Concluding that this communication did not satisfy the notice requirements of the Act and that Claimant's medical evidence did not prove that this fall caused a compression of Claimant's cervical nerve roots, we reverse.

1. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4, 2501–2708.

## Background

In January 2004, Claimant began working at Employer's warehouse and trucking facility as a "yard jockey." His duties required him to drive trucks around the facility for loading and unloading. On February 3, 2011, Claimant fell on ice at the facility. In August 2011, Claimant sought treatment for pain and weakness in his right arm. In December 2011, Claimant filed a claim petition, seeking medical compensation for disc herniations at C6–7 and C8–T1 and asserting that the herniations were caused by his fall in February. Claimant's petition alleged that he gave oral and written notice of his fall and injury to Employer on the day it occurred. Employer's answer denied the allegations.

The matter was assigned to a WCJ, who conducted hearings at which both parties appeared. At the outset, Claimant orally amended his claim petition to seek ongoing total disability benefits as of January 16, 2012, when his neck surgery made it impossible to work. Claimant also amended his petition to request an award of disfigurement benefits for the surgical scars on his neck. In response, Employer amended its answer to deny liability for Claimant's disability or disfigurement.

Claimant testified about his February 3, 2011, fall at work. At approximately 5:30 a.m. on that day he parked a truck at the loading area. While walking around the truck, Claimant fell on ice, hitting his back, shoulder and arm. He went inside the building and told Brian Yoder, a co-worker who worked in the shipping department, that he had fallen. Yoder gave Claimant an injury report form and told him to give it to his supervisor.

Claimant explained that his supervisor is Julie Troxel, his daughter-in-law. Because of this family relationship, Claimant does not report work injuries to her, but to Troxel's supervisor. In February 2011, Employer was in the process of replacing supervisors, leaving Claimant unsure about the identity of the person to whom he should give the report. In any case, the incident occurred very early in the morning before the supervisors had reported to work. Accordingly, Claimant slipped the completed injury report under the door of the office used by the manager. Claimant testified that on that same day he spoke with Troxel about his fall.

Claimant continued to work fulltime. At some point, Claimant developed pain in his right arm, which worsened over time. In June 2011, Claimant injured his ankle at work and missed work for a month. When Claimant returned to work in August 2011, he decided to see a doctor for his arm pain.

In late August 2011, Claimant informed a manager, John Cusatis, that he needed medical treatment for his February 2011 injury.[2] Claimant asked Cusatis for the workers' compensation claim number so he could give it to the doctor. Cusatis replied that there was nothing about the incident in Claimant's file. Claimant then spoke to Lisa Epler, who handles workers' compensation claims for Employer, and she told him that the only record of a fall by Claimant was one that occurred in February 2010. Epler told Claimant that he needed to have his supervisor send her a report of the February 2011 fall. Claimant testified that he located a copy of the February 2011 injury report at his home and gave it to Cusatis on November 30, 2011. Cusatis had Julie Troxel enter the information into the computer system but advised Claimant

2. Claimant did not know when Cusatis began working at Employer's facility, but he was not

there in February 2011.

1032 ■

that it was too late to report a February 2011 incident.

Claimant acknowledged that he had suffered a prior injury while working for a different employer that required surgery to his right shoulder and neck in 2001. However, Claimant returned to work after that surgery and did not receive treatment for his neck again until August of 2011.

Claimant offered into evidence a form entitled "Supervisor's Report of Injury" dated February 3, 2011. Reproduced Record at 160a–61a (R.R. ——). The first page is to be completed by a supervisor, and the second page is to be completed by the employee. Claimant filled out both pages of the form, signed and dated it. Claimant wrote that he had fallen and hit his right elbow, head and neck. Claimant acknowledged that a supervisor had not signed the form in the designated space.

The record showed that Claimant has reported several workplace injuries over the course of his employment with Employer. In 2005, he reported a left foot injury. In 2007, he reported a right knee injury. In February 2010, he reported that he fell on ice and twisted his left arm. On June 27, 2011, he reported an injury to his right ankle at work, which required treatment at the emergency room. Claimant reported each one of these injuries *in writing* to Troxel, to Epler or to another supervisor.

At the final hearing, the WCJ viewed Claimant's surgical scars. The WCJ described a diagonal scar on the front of Claimant's neck as a faint white line five or six inches long running from the top of his neck to his sternum. The WCJ also described a vertical scar on the back of Claimant's neck as an indented straight line three to four inches long running from his hairline to the base of his neck.

Claimant presented the deposition testimony of Raymond Truex, Jr., M.D., a board certified neurosurgeon. Dr. Truex's physician's assistant saw Claimant on October 24, 2011, for complaints of pain as well as tingling and numbness in his right arm and fingers. Claimant had already seen his family doctor, who ordered an MRI in August 2011, which Dr. Truex reviewed. It showed Claimant's 2001 cervical fusion at C3–4 and C5–6. The MRI also showed bulging discs at C6–7 and C7–T1 with narrowing of the opening through which the C–7 and C–8 nerve roots pass from the spinal column. Dr. Truex testified that the bulging discs and narrowed opening were caused by Claimant's long term degenerative disc disease. Dr. Truex opined that Claimant's 2001 surgery may have accelerated the degenerative changes present from C6 to T1.

In November 2011, Dr. Truex ordered an EMG that confirmed that Claimant's nerve roots at C–7 and C–8 were impinged, causing Claimant's right arm and hand symptoms. On December 7, 2011, Dr. Truex examined Claimant. Based on this examination, Claimant's medical history, the MRI and EMG test results, Dr. Truex diagnosed Claimant with preexisting disc degeneration compressing the nerve roots at C–7 and C–8. Because Claimant reported that he had been asymptomatic before falling at work on February 3, 2011, Dr. Truex opined that "some injury to [Claimant's] nerve roots must have occurred at the time of the fall" and caused his symptoms. R.R. 179a.

On January 17, 2012, Dr. Truex did surgery at C6–7 to free the nerve root. On March 27, 2012, Dr. Truex did surgery on Claimant's C7–T1 area through an incision on the back of Claimant's neck. Dr. Truex testified that Claimant needed physical therapy and was not yet ready to return to his pre-injury job.

Employer presented the deposition testimony of John F. Perry, M.D., a board certified orthopedic surgeon who did an independent medical examination (IME) of Claimant on April 3, 2012. At that time, Claimant was one week post-surgery and demonstrated a decreased range of motion and pain at the incision site. Based on a physical examination, Claimant's history and Claimant's medical records, Dr. Perry diagnosed Claimant with cervical degeneration that had tightened his spinal canal. Dr. Perry agreed that the surgeries performed by Dr. Truex were appropriate treatment but disagreed about the cause of Claimant's condition. Dr. Perry acknowledged that the fall described by Claimant could have aggravated his underlying degenerative condition. However, the MRI did not show a traumatic injury. Further, Claimant did not develop symptoms for many months, which was not normal for a traumatic injury. Dr. Perry opined that Claimant's cervical condition resulted from his degenerative disc disease and not from a trauma.

Employer presented the deposition testimony of Brian Yoder. Yoder testified that he works for Employer but is not a supervisor and was not a supervisor in February 2011. Yoder had no recollection of Claimant telling him that he fell on February 3, 2011. Yoder stated that if Claimant had reported a fall, he would have told him to fill out an accident report and give it to Troxel, Claimant's supervisor.

Employer presented Troxel's deposition testimony. Because of the family relationship, Troxel does not discipline Claimant. However, Claimant does report injuries to her and has done so in the past. For example, when Claimant fell at work in February 2010, Troxel and Claimant together filled out, and signed, a Supervisor's Report of Injury on the day of the incident. The same procedure was followed for Claimant's June 2011 work injury to his ankle. Troxel testified that it is standard for her to enter the information from the supervisor's report into Employer's computer system, after which Epler confers with the employee.

Troxel testified that the first time she heard about Claimant's alleged February 2011 work injury was on December 1, 2011, when her boss, Cusatis, handed her Claimant's copy of his injury report. Troxel entered the information from Claimant's injury report into the computer system on December 1, 2011. Troxel had heard Claimant complain of general aches and pains involving his neck and right arm, but he never told her that these pains were related to his work.

Employer's senior operations manager, Cusatis, testified. He stated that yard jockeys report injuries to their supervisor, Troxel, and she enters the information into Employer's computer system. Only Troxel can put the information into the system for the yard jockeys; a supervisor from a different department cannot do so. Cusatis stated that because he is a manager, a yard jockey could report an injury to him. However, at no point between February 2011 and November 2011 did Claimant report neck or right arm problems, but he did report the June 2011 ankle injury.

In late November 2011, Claimant informed Cusatis that he needed medical treatment for a neck and arm problem and produced the injury report dated February 3, 2011. This was the first time Cusatis learned of the February 3, 2011, incident. After consulting with others, Cusatis had Troxel enter the information from Claimant's injury report into the computer system. Cusatis advised Claimant that he was unsure whether Employer would "be able to do anything with this" because Claimant had waited so many months to turn in the injury report. R.R. 354a.

Epler also testified. She confirmed that standard protocol required Claimant to report injuries to Troxel, who would enter the information into the computer system. These steps were followed for Claimant's February 2010 and June 2011 work injuries. When Epler spoke to Claimant in June 2011 about his ankle injury, he never mentioned a February 2011 work injury. Epler learned about the February 2011 incident from Cusatis in November or December of 2011.

Sonny Lall testified by deposition. He explained that in February 2011, he worked at Employer's facility every other week, serving as a supervisor. Lall stated that it would have been appropriate for Claimant to report a work injury to him, but Claimant never did. Lall alone occupied the office described by Claimant, which he kept locked when he was not present. Lall stated that he never saw the injury report Claimant said he slid under Lall's office door.[3]

■ The WCJ found Claimant's testimony to be credible based upon his demeanor. The WCJ discredited Employer's fact witnesses for several reasons,[4] beginning with the fact that they work for Employer. The WCJ found it incredible that Troxel, who saw Claimant regularly as a family member and at work, never asked Claimant about the cause of his neck and arm complaints. The WCJ credited

Dr. Truex over Dr. Perry because Dr. Truex saw Claimant on more than one occasion and had the opportunity to examine Claimant's spine during the two surgeries.

Based on these credibility determinations, the WCJ found that Claimant fell at work on February 3, 2011, thereby aggravating his degenerative disc disease at C6–7 and C7–T1 and causing impingement of his nerve roots. The WCJ found that "Claimant provided timely notice of the injury to the Employer when he reported it to Mr. Yoder on February 3, 2011." WCJ Decision, January 29, 2013, at 11; Finding of Fact No. 25. The WCJ found that the work injury disabled Claimant as of January 16, 2012, and caused two permanent and unsightly cervical scars. The WCJ awarded total disability compensation and 75 weeks of disfigurement benefits, to begin upon cessation of the disability benefits.

■ Employer appealed, and the Board affirmed on the basis of the WCJ's credibility determinations with little discussion. The Board also stated that it viewed Claimant's scars and agreed with the WCJ that an award of 75 weeks of compensation is fair and reasonable. Employer then petitioned for this Court's review.[5]

### Appeal and Analysis

On appeal, Employer argues that the Board erred for three reasons. First, the

---

3. Two employees, who have keys to Lall's office, also testified that they used the office for conference calls on Mondays and Fridays but never saw the injury report described by Claimant. Another employee who cleaned out the office in July 2011 testified that she went through every file in the office and did not find the injury report described by Claimant.

4. The WCJ has complete authority over questions of credibility, conflicting medical evidence and evidentiary weight. *Sherrod v. Workmen's Compensation Appeal Board (Tho-*

*roughgood, Inc.),* 666 A.2d 383, 385 (Pa. Cmwlth.1995).

5. This Court's review of an order of the Board is limited to determining whether the necessary findings of fact are supported by substantial evidence, whether Board procedures were violated, whether constitutional rights were violated or an error of law was committed. *Cytemp Specialty Steel v. Workers' Compensation Appeal Board (Crisman),* 39 A.3d 1028, 1033 n. 6 (Pa.Cmwlth.2012).

WCJ's factual findings did not support the legal conclusion that Claimant gave timely and proper notice of an injury to Employer. Second, the testimony of Claimant's medical expert was not competent to support a finding that Claimant sustained a work injury. Third, the award of 75 weeks of disfigurement benefits cannot be sustained because Claimant did not satisfy his burden with respect to his claim petition. We address these issues *seriatim.*

■ In its first issue, Employer argues that Claimant did not provide Employer with timely and proper notice of a February 3, 2011, work injury. Employer contends that simply telling Brian Yoder that he fell, even if true, did not satisfy the Act's notice requirements.[6] Accordingly, the claim petition should have been denied.

■ The claimant has the burden of proving all elements necessary to support an award of benefits. *Inglis House v. Workmen's Compensation Appeal Board (Reedy)*, 535 Pa. 135, 634 A.2d 592, 595 (1993). Section 311 of the Act requires the claimant to inform his employer of a work injury within 120 days of its occurrence. If he fails to do so, he is ineligible for compensation. 77 P.S. § 631.[7] This deadline cannot be extended where the claim-

ant asserts that he told a fellow employee of the injury. *Canterna v. United States Steel Corporation*, 12 Pa.Cmwlth. 579, 317 A.2d 355, 357 (1974) (holding a claimant's injury report to a fellow employee did not satisfy the Act because the claimant's supervisor did not learn of the injury until six months later). Timely notice "protect[s] the employer from stale claims for accidental injuries, of which [the employer] would have no knowledge, made after opportunity had passed for a full and complete examination thereof." *Id.* at 356.

■ Section 312 of the Act enumerates what information must be included in the notice. It states as follows:

> The notice referred to in section 311 shall inform the employer that a certain employe received an injury, described in ordinary language, in the course of his employment on or about a specified time, at or near a place specified.

77 P.S. § 632. Section 313 of the Act states that notice "may be given to the immediate or other *superior* of the employe, to the employer, *or any agent of the employer* regularly employed at the place of employment of the injured employe." 77 P.S. § 633 (emphasis added).[8] This

---

6. Whether proper notice was given is a mixed question of fact and law. *Gentex Corporation v. Workers' Compensation Appeal Board (Morack)*, 611 Pa. 38, 23 A.3d 528, 534 (2011).

7. Section 311 states as follows:
   Unless the employer shall have knowledge of the occurrence of the injury, or unless the employe or someone in his behalf, or some of the dependents or someone in their behalf, shall give notice thereof to the employer within twenty-one days after the injury, no compensation shall be due until such notice be given, and, *unless such notice be given within one hundred and twenty days after the occurrence of the injury, no compensation shall be allowed.* However, in cases of injury resulting from ionizing radiation or any other cause in which the

nature of the injury or its relationship to the employment is not known to the employe, the time for giving notice shall not begin to run until the employe knows, or by the exercise of reasonable diligence should know, of the existence of the injury and its possible relationship to his employment. The term "injury" in this section means, in cases of occupational disease, disability resulting from occupational disease.
77 P.S. § 631 (emphasis added).

8. Section 313 states in its entirety as follows:
   The notice referred to in sections 311 and 312 may be given to the immediate or other superior of the employe, to the employer, or any agent of the employer regularly employed at the place of employment of the injured employe. Knowledge of the occur-

Court has considered what is meant by the phrase "any agent of the employer" found in Section 313 and explained that:

> We do not believe the term "any agent of the employer" means that information of an accident may be given to any other employee. This would render the whole process meaningless.

*Canterna,* 317 A.2d at 357. Rather, "agent of the employer" means "a person 'whose position justifies the inference that authority has been delegated to him by the employer, as his representative, to receive a report or notice of such accidental injury.'" *Padilla v. Chain Bike Corporation,* 27 Pa.Cmwlth. 190, 365 A.2d 903, 904–05 (1976) (quoting *Canterna,* 317 A.2d at 357). Accordingly, a foreman whose duties included making accident reports for Spanish-speaking employees to the employer was an "agent of the employer." *Padilla,* 365 A.2d at 904–05.

■ In the instant case, the WCJ's sole finding of fact regarding notice was as follows:

> This [WCJ] further finds that Claimant provided timely notice of the injury to the Employer when he reported it to Mr. Yoder on February 3, 2011.

WCJ Decision, January 29, 2013, at 11; Finding of Fact No. 25. Employer argues that this factual finding is inadequate to sustain the legal conclusion that Claimant complied with the notice requirements of the Act. The WCJ did not find that Yoder was a supervisor or "agent of the employer" for purposes of receiving notice of Claimant's work injury. Claimant responds that Employer is simply attacking the WCJ's credibility determination.

Claimant testified that after he fell, he went inside the building to the shipping office and told Brian Yoder. Claimant testified that "Brian Yoder is—*I don't even think he's a supervisor.* He's just the person they have in charge running day-shift shipping." R.R. 98a (emphasis added). At a subsequent hearing, Claimant stated that Yoder "was an acting supervisor. I don't know if he officially got that title or not." R.R. 123a. Nevertheless, Claimant acknowledged that Yoder instructed him "to fill out an injury report and give it to my supervisor." R.R. 76a. Claimant testified that after completing the injury report that Yoder gave him, he "threw it under the main office door" in the yard jockey area. R.R. 124a.

Yoder testified that he did not recall Claimant ever telling him about a fall on February 3, 2011; he is not a supervisor; and if a co-worker had reported a work injury to him, he "would send [the co-worker] to the supervisor who was on duty." R.R. 308a. At one point in his testimony Claimant suggested that Yoder was an "acting supervisor," but at another point he corroborated Yoder's testimony that he was not a supervisor, just the person "running dayshift shipping." R.R. 98a. In any case, as Employer points out, the WCJ did not make a finding that Yoder was a supervisor.

■ However, even if the WCJ had made such a finding, Claimant cannot prevail. A title is not dispositive of who a claimant should inform of a work injury. Giving notice to simply "any other employee" is not sufficient to meet the Act's notice requirement. *Canterna,* 317 A.2d at 357. Regardless of whether Yoder was an "acting supervisor" or what that term means, Claimant presented no evidence that Yoder was authorized as Employer's

rence of the injury on the part of any such agents shall be the knowledge of the employer.

77 P.S. § 633.

"representative, to receive a report or notice" of Claimant's injury. *Padilla*, 365 A.2d at 905. In fact, Claimant's own testimony belies the notion that Employer had authorized Yoder to receive notice of Claimant's work injury. First, Claimant identified different individuals to whom he had reported other work injuries, or could have, and none was Yoder.[9] Second, Claimant's statement that Yoder instructed him to give a written report to his supervisor undermines the WCJ's assumption that Yoder was the person serving as Employer's agent for purposes of receiving work injury notice. Third, and most importantly, Claimant offered no evidence that he described his injury to Yoder.

Claimant's fall on February 3, 2011, was one of many mishaps he experienced while working for Employer. On every other occasion, Claimant told his supervisor about the work injury and filled out an injury report that was placed into Employer's computer system. Claimant knew how to follow Employer's protocol for reporting a work injury.

■ The WCJ did not find, and Claimant does not argue, that sliding his injury report under the locked door of the manager's office satisfied the notice requirement. The claimant must prove that his employer actually received notice of a work injury. *See Storer v. Workers' Compensation Appeal Board (ABB)*, 784 A.2d 829, 833 (Pa.Cmwlth.2001) (mailing letter to employer addressed "to [w]hom it may concern" reporting a work-related heart attack deemed insufficient to establish proper notice where there was no evidence that the employer ever received the letter). The evidence shows that Employer first learned of the February 3, 2011, injury when Claimant gave a copy of the report to Cusatis on November 30, 2011, and this was well past the 120–day deadline for giving notice under the Act.

Claimant emphasizes the WCJ's statement that she found it "very difficult to believe" that Troxel never asked Claimant about the cause of his complaints. WCJ Decision, January 29, 2013, at 10; Finding of Fact No. 23. This discussion does not constitute a finding of fact about notice. However, even if it could be so construed, it is irrelevant. Claimant had 120 days from February 3, 2011, that is until June 3, 2011, to report a work injury. Troxel testified that she heard Claimant complain about neck and arm problems, but she did not say whether she heard these complaints before or after June 3, 2011. Notably, the WCJ's negative credibility finding about Troxel does not constitute substantial evidence that can support a factual finding that Claimant gave the type of notice required by the Act and within the prescribed deadline. *Yi v. State Board of Veterinary Medicine*, 960 A.2d 864, 875 (Pa.Cmwlth.2008). Further, Claimant did not testify that he ever told Troxel that he had sustained a work injury.[10] It was Claimant's burden to prove that Employer received actual notice of his work injury within 120 days and he did not so prove.[11]

9. These individuals included Sonny Lall, Julie Troxel and Lisa Epler.

10. Claimant points out that he testified he told Troxel on February 3, 2011, that he had fallen. The WCJ did not find that he did so. At any rate, Claimant's testimony that he spoke with Troxel suffers from the same deficiency as his described discussion with Yoder, namely, it lacks specific information about what he said and whether he described an injury.

11. Claimant testified he told Cusatis and Epler about his work injury in August 2011 when he told them he needed medical treatment for it. The WCJ made no finding of fact as to whether this conversation actually occurred, which Cusatis and Epler denied. It is of no moment because the last day for Claim-

**1038** ■ ■

The Act's notice requirement "protect[s] the employer from stale claims for accidental injuries, of which [the employer] would have no knowledge, made after opportunity had passed for a full and complete examination thereof." *Canterna*, 317 A.2d at 356. That is precisely what occurred in this case. Individuals authorized by Employer to receive notice of a work injury did not receive this notice until months after the date of Claimant's fall. As a result, Employer was deprived of the opportunity to investigate what happened and to send Claimant to a panel physician right away to determine if he had been injured. Because Claimant failed to provide Employer with timely proper notice of a work injury, his claim petition must be denied.

Nevertheless, for completeness we will address Employer's other issues. They include Employer's assertions that Claimant's medical evidence was incompetent on causation and that Claimant is not entitled to disfigurement benefits.

■■■ Where there is no obvious causal connection between an injury and the alleged work-related cause, the claimant must offer competent medical evidence to prove that connection. *Budd Trailer Company, Inc. v. Workmen's Compensation Appeal Board (Behney)*, 105 Pa. Cmwlth. 258, 524 A.2d 525, 527 (1987). The medical expert must opine that "in his professional opinion, the injury came from the related incident." *Industrial Recision Services and Ohio Casualty Group v. Workers' Compensation Appeal Board (Farbo)*, 808 A.2d 994, 997–98 (Pa.Cmwlth. 2002). Our Supreme Court has held that a "physician's assumption that an injury is caused by a recent event because of the temporal proximity is not a sufficiently competent opinion to establish a causal relationship." *Lewis v. Workmen's Compensation Appeal Board (Pittsburgh Board of Education)*, 508 Pa. 360, 498 A.2d 800, 803 (1985).[12]

■■■ Here, the WCJ found that Claimant fell at work on February 3, 2011. However, he lost no time from work and sought no medical treatment. Claimant was out of work for approximately four weeks in the summer of 2011 for a separate work-related ankle injury. He testified that "before that I noticed I was having like tendonitis in my right arm." R.R. 79a. Claimant did not seek medical treatment until August 2011 because "when I was working, it just felt like I was starting to get a little bit of [tendonitis] in my arm. And it kept getting worse and worse over time." R.R. 128a.

Dr. Truex testified that Claimant has long-standing degenerative cervical disc disease, which caused narrowing of the openings through which the nerve roots exit the spinal canal. As to causation, Dr.

ant to provide timely notice was June 3, 2011, making notice in August 2011 untimely.

12. In *Lewis*, the Court deemed incompetent the testimony of a doctor who assumed that the claimant's neck was injured when he was moving gym equipment because the claimant mentioned that his pre-existing neck condition was severely aggravated after that incident. *Moyer v. Workers' Compensation Appeal Board (Pocono Mountain School District)*, 976 A.2d 597 (Pa.Cmwlth.2009), is also instructive. In that case, the WCJ found that the claimant, who had a history of back prob-

lems, sustained a disabling aggravation of his pre-existing back condition when he lifted a bucket of water at work, heard a pop in his back, and immediately experienced severe back pain causing him to fall to the floor and leave work. This Court determined that the claimant's medical evidence was competent, noting that, unlike *Lewis*, it was not a situation where "the physician assumed that the claimant's condition was a result of the work incident because the claimant mentioned that he felt worse after." *Id.* at 600.

Truex offered the following relevant testimony:

[Claimant's Counsel]: And I know you don't do a lot of Workers' Compensation, but it's pretty well understood that degenerative findings exist over an extended period of time. You would agree with that?

[Dr. Truex]: Yes.

[Claimant's Counsel]: Why do you relate [C]laimant's symptoms to the fall in February of 2011 as compared to just the natural progression of his degenerative findings?

[Dr. Truex]: *I say so because of the temporal relationship of these two events.* Although there were degenerative changes there, the nerve roots were not being affected by these degenerative changes. Whereas, after the fall, the patient became symptomatic. So some injury to the nerve roots must have occurred at the time of the fall.

R.R. 178a–79a (emphasis added).

Dr. Truex's testimony suffers from the deficiency identified in *Lewis.* Dr. Truex opined that Claimant must have been injured in the February 2011 fall because he later experienced symptoms. However, neither Dr. Truex nor Claimant testified about the inception of these symptoms. Claimant testified, somewhat vaguely, that

his arm started to hurt "before" he injured his ankle in late June 2011. R.R. 79a. However, Claimant did not seek medical treatment until August 2011 and did not see Dr. Truex until the end of October 2011. Dr. Truex's opinion that the February 3, 2011, fall at work led to symptoms at an unknown point in time is incompetent to prove causation.[13]

■ Finally, Employer argues that the Board erred in affirming the WCJ's award of 75 weeks of disfigurement benefits for cervical surgical scars when the surgeries were not necessitated by a work injury, the amount of weeks awarded exceeded what is customary for Claimant's type of scars, and the Board never actually viewed Claimant's scars. Although the Board stated in its adjudication that it viewed the scars, it could not have done so. Claimant did not attend the oral argument before the Board.[14] Claimant responds that Employer did not dispute the number of weeks of disfigurement benefits awarded in its appeal to the Board and, therefore, the issue is waived.

Because we reverse the grant of the claim petition for Claimant's failure to comply with the Act's notice requirements or to offer competent medical evidence on causation, Claimant is not entitled to any disfigurement benefits. We need not fur-

---

13. Employer argues that the WCJ's stated reason for finding Dr. Truex more credible than Dr. Perry violates Employer's due process rights. The WCJ's stated reason for rejecting Dr. Perry's testimony was that Dr. Truex saw Claimant more times than did Dr. Perry. Employer is limited to one physical examination and cannot force Claimant to submit to exploratory surgery in order to have the same opportunity to examine the spine inter-operatively. Employer argues that under the WCJ's analysis, its expert could never be found credible, which violates due process. Because we conclude that Dr. Truex's opinion on causation was incompetent, we do not address this issue.

14. Section 306(c)(22) of the Act, 77 P.S. § 513(22), permits an award of up to 275 weeks for a disfigurement, but gives no specific guidance on what different types of disfigurement should be worth. Therefore, the Board personally views the claimant's scars in order to determine whether the WCJ entered "an award significantly outside the range most [WCJs] would select." *Hastings Industries v. Workmen's Compensation Appeal Board (Hyatt),* 531 Pa. 186, 611 A.2d 1187, 1190 (1992). If it is, the Board "may modify the award as justice may require." *Id.*

ther address whether an award of 75 weeks was appropriate or whether the Board was mistaken when it stated that it had personally viewed Claimant's scars.

## Conclusion

For the above-stated reasons, we reverse the Board's grant of the claim petition filed by Claimant.

## ORDER

AND NOW, this 17th day of June, 2015, the order of the Workers' Compensation Appeal Board dated April 3, 2014, in the above-captioned matter is hereby REVERSED.

## DISSENTING OPINION BY PRESIDENT JUDGE PELLEGRINI.

Because there was substantial evidence to support the Workers' Compensation Judge's (WCJ) finding that Claimant gave timely notice to Employer of his work injury, I would affirm.

After Claimant told a co-worker that he had fallen, Claimant testified that the co-worker gave him an injury report form and told him to give the form to a supervisor. Claimant explained that his supervisor was his daughter-in-law and that he was not supposed to report work injuries to her, but to his daughter-in-law's supervisor. Claimant testified that he was unsure of whom his daughter-in-law's supervisor was, but that he only came to the plant every other week. Claimant then testified that he slipped the completed injury report under the door of the office used by this manager. He then testified that he also spoke to his daughter-in-law about the accident on the day that he fell. The WCJ accepted his testimony as credible.

The majority finds that the notice was insufficient because Claimant never told his daughter-in-law the nature of his inju-

ries and that there was no evidence that Employer otherwise had notice, even though Claimant testified that he slipped a completed work injury report under the manager's door. However, while Claimant may have mistakenly believed that he could not give notice of his injury to his daughter-in-law, notice can be given to anyone and once it is given, notice is imputed to the employer. In this case, there is no dispute that notice of the injury to his daughter-in-law's manager would constitute notice to the Employer.

Once the WCJ found that Claimant had slipped the completed injury report under the manager's door, a manager who only came to that office every other week, that finding constitutes substantial evidence that Claimant gave the requisite notice.

Accordingly, I respectfully dissent.